[Crim. No. 1808. Third Dist. Dec. 31, 1942.]

In re FRED MARTINEZ, on Habeas Corpus.

R. H. Schwab for Petitioner.

Hugh B. Bradford, City Attorney (Sacramento), Otis D. Babcock, District Attorney, and Richard J. Lawrence, Deputy District Attorney, for Respondent.

THE COURT.—Petitioner was convicted in the Police Court of the City of Sacramento of violating a municipal ordinance fixing the rate of charges for taxicab service rendered within the city limits. On habeas corpus he asserts that he is now illegally restrained of his liberty because said ordinance is unconstitutional insofar as it attempts to fix such rates. It is not contended that it is unreasonable or discriminatory.

Prior to the filing of the petition herein an appeal was taken to the superior court where the judgment of the police court was affirmed. Because of this, respondent now contends that the present proceeding constitutes a collateral attack on the judgment of conviction. He cites in support of this contention, *In re Connor,* 16 Cal.2d 701 [108 P.2d 10]; *In re Smith,* 161 Cal. 208 [118 P. 710]; *In re Northcott,* 71 Cal.App. 281 [235 P. 458]; and *In re Booth,* 44 Cal.App. 660 [186 P. 841], where the rule is announced that after affirmance on appeal a judgment of conviction cannot be collaterally attacked on habeas corpus for grounds that were reviewable on that appeal. ■ But this rule has no application to the instant case. In the cases cited there was no question of the constitutionality of a statute or ordinance involved; the alleged errors were committed in the admitted exercise of jurisdiction. ■ It is now well settled in this state that apart from any remedy by appeal, the courts can permit an independent review by habeas corpus for the purpose of determining the question of constitutionality of a statute or ordinance. (*In re Bell,* 19 Cal.2d 488 [122 P.2d 22].) In that case it is pointed out that where the question of constitutionality arises in a justice's or municipal court and the right of appeal extends to the superior court only, there is no other way in which the question can be presented to a higher court. (See, also, *In re Cohen,* 107 Cal.App. 288 [290 P. 512].)

Petitioner contends that the exclusive power to fix such rates is vested in the Railroad Commission by section 23 of article XII of the Constitution and the Public Utilities Act. (Act 6386, Deering's Gen. Laws.)

Section 23, *supra,* reads in part as follows:

"Every private corporation, and every individual or association of individuals, owning, operating, managing, or controlling any commercial railroad, interurban railroad, street railroad, canal, pipe line, plant, or equipment, or any part of such railroad, canal, pipe line, plant or equipment within this State, for the transportation or conveyance of passengers, or express matter, or freight of any kind, including crude oil, or for the transmission of telephone or telegraph messages, or for the production, generation, transmission, delivery or furnishing of heat, light, water or power or for the furnishing of storage or wharfage facilities, either directly or indirectly, to or for the public, and every common carrier, is hereby declared to be a public utility subject to such control and regulation by the Railroad Commission as may be provided by the Legislature, and every class of private corporations, individuals, or associations of individuals hereafter declared by the Legislature to be public utilities shall likewise be subject to such control and regulation. The Railroad Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution. . . . "

This section granted no direct authority to the Railroad Commission. By it the Legislature was granted plenary power to confer such authority upon the Railroad Commission unlimited by other provisions of the Constitution, and the Commission was to have only such power as should "be conferred upon it by the Legislature." We must, therefore, look to the Public Utilities Act to determine whether or not the Legislature has given the Railroad Commission the power to fix such rates.

Turning to the act we find that there is no mention of taxicabs therein. Nevertheless, petitioner argues that they are "common carriers" under the definition contained in the Civil Code, and that the Public Utilities Act declares that all common carriers are public utilities subject thereto. Section 2168 of the Civil Code provides that "everyone who offers to the public to carry persons . . . is a common carrier of

whatever he thus offers to carry," and under this definition it has been held that a taxicab company which holds itself out to serve those who apply for transportation is a common carrier. (*Bezera* v. *Associated Oil Co.,* 117 Cal.App. 139 [3 P.2d 622].) It does not follow, however, that taxicab companies are common carriers within the meaning of the Public Utilities Act. (2 Deering's Gen. Laws of 1937, Act 6386, p. 3119.)

Section 1 of the act provides that it "shall apply to the public utilities and public services *herein described.*" (Italics supplied.) The use of the phrase "herein described" is particularly significant when succeeding sections of the act are analyzed, and it appears clearly that it was used advisedly.

Subdivision (dd) of section 2, provides:

"The term 'public utility,' *when used in this act,* includes every common carrier, toll bridge corporation, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger, warehouseman, and heat corporation, where the service is performed for or the commodity delivered to the public or any portion thereof." (Italics added.)

Subdivision (1) of section 2 provides:

"The term 'common carrier,' *when used in this act,* includes every railroad corporation; street railroad corporation; express corporation; freight forwarder; dispatch, sleeping car, dining car, drawing-room car, freight, freight-line, refrigerator, oil, stock, fruit, car loaning, car renting, car loading and every other car corporation or person. . . . " (Italics added.)

Each of the agencies mentioned in subdivisions (dd) and (1) is specifically mentioned and described in great detail or is included in groups carefully described in the act. There is no reference whatever to taxicabs or taxicab companies and it is apparent that if the Legislature had intended to include them it would not have omitted such a reference and description while including detailed descriptions of all other agencies involved. ██ We are of the opinion that the definition of common carrier found in the Civil Code (§ 2168) has no application to the act; that the act provides its own definitions; and that as used in subdivision (1) of section 2 the word "includes" is a word of limitation and has the effect

of confining the term "common carrier" to those agencies specifically mentioned therein.

Other portions of the act afford evidence in support of these conclusions. Numerous references to common carriers *subject to the provisions of this act* indicate an intention not to include *all* common carriers. Again, the specific and detailed descriptions of agencies performing services similar to taxicab service, such as passenger stage corporations, highway common carriers, and street railroads, when coupled with the complete absence of any reference to taxicabs, appear to remove all doubt on this point.

For the foregoing reasons we conclude that the city of Sacramento was not precluded from fixing such rates because of anything contained in section 23 of article XII of the Constitution or in the Public Utilities Act.

Petitioner argues that aside from questions involving the jurisdiction of the Railroad Commission the city has no power to fix such rates.

Section 13 of the city charter grants authority to fix rates of compensation of public utilities in the city but we are of the opinion that a taxicab company is not a public utility. No cases have been called to our attention holding that it is. ■ One of the tests of a public utility and the feature that distinguishes it from other forms of public service is that the public and every individual member thereof has the right to demand that the service shall be conducted, so long as it is continued, with reasonable efficiency, under reasonable charges, *as a legal right.* ■ In view of the fact that the public would not have the legal right to demand such service we conclude that taxicab companies cannot be classed as public utilities within the meaning of the charter provision. It should be noted, however, that we are not concerned here with the question that would be presented if the Legislature had conferred such powers on the Railroad Commission under its constitutional grant.

Respondent contends that under the power of "home rule" granted by sections 6 and 8 of article XI of the Constitution the city has authority to fix such rates as a "municipal affair."

Since the state first enacted a general scheme for the regulation of vehicles throughout the state the trend of the decisions has been toward the concentration of control over roads and streets in the state. No useful purpose would be

served by a review of these authorities here. In *Morel* v. *Railroad Commission*, 11 Cal.2d 488 [81 P.2d 144], it was contended that the regulation of private carriers doing business on city streets was a municipal affair subject to regulation by the city only. After stating the result of prior decisions governing the regulation of vehicles generally, the court said:

"It is true that these cases involve regulation of the *use* of city streets and the instant case relates to the regulation of a *business* transacted upon such streets. . . . But the transacting of business upon a street necessarily requires the use of the street for that purpose, and the use of the street for the purpose of transacting business thereon is as a rule a much more onerous and burdensome use than the mere traveling over said streets by ordinary private conveyance. If the latter use is a matter of public concern, we think the former which imposes far greater burdens upon the streets is also a matter of public concern and therefore subject to regulation imposed by the state."

The very purpose of fixing rates for taxicab service is the regulation of the character and standard of service to be performed on city streets and we think that it is so closely connected with the general scheme of regulation that it cannot be declared to be a purely municipal affair.

Finally, respondent argues that the city had the power to pass an ordinance fixing such rates under the police power granted by section 11 of article XI of the Constitution. That section provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

The ordinance in question is confined in its effect to service performed within the limits of the city and it is conceded that there is no general law in conflict therewith. While the exact point appears not to have been decided in this state, it has been held that the regulation of "jitneys" by requiring that they give a bond is a valid exercise of the police power by a municipality. (*In re Cardinal,* 170 Cal. 519 [150 P. 348, L.R.A. 1915F, 850].) Late decisions of other states support the view that matters of this kind are within the police powers of cities. (*Clem* v. *City of La Grange,* 169 Ga. 51 [149 S.E. 638, 65 A.L.R. 1361]; *People* v. *Smith,*

15 N.Y.S.2d 459; *State* v. *Gamelin,* 111 Vt. 245 [13 A.2d 204]; *Yellow Taxicab Co.* v. *Gaynor,* 82 Misc. 94 [143 N.Y.S. 279] (Aff'd 159 App.Div. 899 [144 N.Y.S. 299]).) The efficient and safe operation of such vehicles is a matter of grave concern to the people of the city and the fixing of such rates contributes directly to the maintenance of safe standards of service. Where the state has not attempted to occupy this field with conflicting legislation, the power to fix such rates is within the police power of the city.

The writ is discharged and the petitioner is remanded.